## IN RE STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Relator

### NO. 02–15–00252–CV

Court of Appeals of Texas, Fort Worth.

DELIVERED: January 26, 2016

---

Janet Colaneri, The Colaneri Firm, P.C., Arlington, TX, Joseph W. Spence, Shannon, Gracey, Ratliff & Miller, LLP, Fort Worth, TX, Attorney for Relator.

Todd Smith, The Todd Smith Law Firm, Bedford, TX, Attorney for Real Party in Interest.

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

## OPINION [1]

ANNE GARDNER, JUSTICE

Relator State Farm Mutual Auto Insurance Company has filed a petition for writ of mandamus asking this court to compel the Honorable Susan McCoy, presiding judge of the 153rd District Court of Tarrant County, to set aside her January 30, 2015 order granting the motion for new trial filed by real parties in interest Scott Newell and Heidi Newell and to reinstate the trial court's September 30, 2014 final judgment. *See* Tex. Gov't Code Ann. § 22.221 (West 2004), *see also* Tex.R.App. P. 52. For the reasons explained below, we conditionally grant the petition.

## I. Background

The Newells sued State Farm, their insurer, for underinsured motorist benefits arising from a June 2009 car accident.

Scott claimed the injuries he sustained in the accident necessitated surgery in December 2009. The parties stipulated that the negligence of the other driver, Terry Cox, caused the accident. The parties also stipulated that Scott was insured under a State Farm auto policy that provided underinsured motorist coverage. The remaining issues were tried to a jury.

*The accident*

Scott testified that on June 24, 2009, he stopped his vehicle at a red light at the intersection of North Beach Street and Fossil Vista Road in Fort Worth. Cox's vehicle was initially stopped five to six feet behind him, but then Scott felt an impact from the rear. Scott described the impact as a "jolt" and testified, "It wasn't ragely intensive or anything, but I knew I had been hit by another car." Scott was wearing a seatbelt at the time of the accident and testified that he did not hit the steering wheel or "fly around in the vehicle" as a result of the collision.

Scott got out of his car and saw that Cox's car was still in contact with his car. After Cox backed up, Scott "could see that there was at least some mild damage to [his] vehicle." Scott admitted that the damage to the vehicle was minor, and he did not feel like he was injured. Scott drove his vehicle to work at Dallas Love Field and worked for the rest of the day without any problems.

Cox, who testified through deposition at trial, stated that while he was stopped at the light, he looked to his left, "thought [he] saw some movement like the traffic was getting ready to go," and while he was turning back to look forward, he felt a bump. According to Cox, his foot was on the brake at the time, and he did not recall lessening the pressure on the brake. He was adamant he did not accelerate. At

---

1. Tex.R.App. P. 52.8(d).

first, Cox thought Scott's car had rolled backwards into Cox's car. Cox conceded that he was not sure if Scott's vehicle rolled backwards and that it was possible that Cox's vehicle rolled forward. Cox testified that Scott claimed there was a dent or a crease in his bumper to the left of the license plate, but Cox saw no damage to Scott's car. Cox's vehicle was not damaged. The driver's crash report completed by Cox on the day of the accident stated that he was "stopped at the traffic signal behind [Scott's vehicle]. It seemed to roll backwards as [Cox] crept forward and [Cox] felt a *very* slight bump. No damage was done to either vehicle."

Mike Rangel, a licensed professional engineer in Texas and a licensed and accredited accident reconstructionist, testified as State Farm's accident reconstruction expert. In formulating his opinions, Rangel reviewed a photograph of the post-accident position of the vehicles,[2] photographs of the post-accident condition of vehicles, the drivers' deposition testimonies, the driver's crash report completed by Cox,[3] the repair estimate for Scott's car, the vehicles' specifications, and crash-test data for the two vehicles. Rangel opined that the accident's impact or closing speed was less than four miles per hour, meaning that Cox hit Scott's vehicle at less than four miles per hour. Rangel testified that the position of the vehicles after the accident—they were still touching—was consistent with Cox's vehicle rolling forward at a low speed and making contact with Scott's vehicle. At a higher rate of speed, such as ten miles per hour, the vehicles would be separated post-accident. Rangel testified that based on the closing speed and the lack of damage to the vehicles, the velocity change of Scott's vehicle was less than two miles per hour, meaning that after impact, Scott's vehicle would have moved forward at two miles per hour. According to Rangel, the force and velocity of the accident was the equivalent of backing into a curb at one to two miles per hour.

Based upon his review of the post-accident photographs, other than a chip on Cox's front bumper cover to the left side of the license plate, Rangel could see no discernable damage to Cox's vehicle and observed a little scuff on the left side of Scott's rear license plate. Rangel testified that the repair estimate for Scott's vehicle was $791.41, which was for the refinishing and polishing of the bumper cover. Rangel explained that the bumper cover was not the bumper itself but a plastic cover that covers the bumper. Rangel also noted that Scott's vehicle was equipped with active head restraints, which, in a rear-end collision, limit the amount of rearward motion of an occupant's head. Rangel testified that Scott's airbags did not deploy, but he conceded that they typically do not deploy when a vehicle is hit from behind.

*Scott's Medical History*

Scott testified that he had neck pain in the past. He denied that it was ongoing, continuous pain and described the neck pain as "isolated incidents" from car accidents that occurred several years prior to the June 2009 accident. Scott testified he was in an automobile accident in 1996 that resulted in neck pain. He stated that the pain and the treatment associated with the accident did not persist longer than a few weeks following the accident.

Scott testified that in 1999, Dr. John Ferris—Scott's physician for at least ten

---

2. Scott took the photograph of the post-accident position of the vehicles. The photograph shows the front of Cox's vehicle touching the rear of Scott's vehicle.

3. Rangel testified that he believed that Scott said he filled out a driver's crash report, but he had never seen it.

years prior to the June 2009 accident—treated Scott for a "kink" in his neck that occurred after he turned his head wrong while shaving. Scott's medical records, which were admitted into evidence, stated that Dr. Ferris diagnosed Scott with a muscle spasm in his left posterior cervical muscles. Dr. Ferris prescribed Tylenol 3 and Norflex, a muscle relaxer.

Scott testified that Dr. Ferris also treated him for back and neck injuries he sustained in a 2002 rear-end automobile collision in Florida. The car that rear-ended the vehicle in which Scott was a passenger was traveling at forty miles per hour when it struck the vehicle. The x-rays taken during an emergency room visit when he returned to Texas were negative. Scott was prescribed Flexeril and Vicodin. Scott reported to Dr. Ferris that the medications helped with the pain, but he was still in a lot of pain and had mobility problems. Dr. Ferris's notes stated that Scott's range of motion was severely impaired and that the muscles on Scott's left side were very tight. Dr. Ferris ordered a physical therapy consult for whiplash injury, placed Scott on Naproxen, and ordered Scott to continue with Flexeril and Vicodin twice a day.

In 2004, Scott went to a CareNow clinic complaining of right shoulder and neck pain that he woke up with one morning. Scott denied any injury. He was prescribed anti-inflammatory drugs and muscle relaxers.[4]

In 2005, Dr. Ferris treated Scott for neck and shoulder pain. Scott testified that he just woke up with a stiff neck one morning. Scott reported to Dr. Ferris that he could not turn his head without pain, and Dr. Ferris noted that he had

some cervical myofascial strain and tenderness. Dr. Ferris prescribed rest, heat, a prescription pain-reliever and muscle relaxer, and physical therapy.

Two days before the June 2009 accident, Dr. Ferris saw Scott for his annual physical. No complaints of neck pain were recorded, but Dr. Ferris was concerned about a swollen cervical lymph node and noted that he wanted to recheck it in about two months.

*Scott's Post–Accident Treatment and Activities*

Scott went to work after the accident and the next day. He began to feel sore the night after the accident and started to feel stiffness and some pain the next morning. The stiffness worsened as the day progressed. Scott felt as if he had whiplash; he testified that he knew what whiplash felt like because he had been in a couple of accidents that had resulted in whiplash.

Scott testified that he stopped at a CareNow clinic on his way home from work the day after the accident and that a physician examined him and ordered an x-ray. The medical records from CareNow show that Scott reported neck and upper back pain, stiffness, and restricted movement. Scott's records also state that he was experiencing mild tenderness and muscle spasms and that his range of motion was restricted. Scott was diagnosed with muscle spasms in his neck, and his medical records from CareNow described the x-ray as "negative." The radiologist's report stated that there was a reversal of the normal lordotic curvature secondary to spasm and that there was a posterior narrowing of the C4–C5 disc space. Scott

4. Records from Scott's 2004 CareNow visit were not admitted into evidence at trial. Records from this visit were used as an exhibit and were discussed during the deposition of

Dr. Larry Kjeldgaard, one of Scott's treating physicians. Dr. Kjeldgaard's video deposition was played for the jury at trial.

testified that he was prescribed anti-inflammatories and pain medication.[5] Scott paid CareNow $198 for the exam.

Scott testified that each day after the accident, he would start out with stiffness in his neck, which would radiate pain through his right shoulder blade as the day progressed. He only took the anti-inflammatories and medication prescribed by CareNow for a short time, and after that, he took Ibuprofen and treated himself with back massages. Scott testified that his condition did not improve. Because of the pain, he was not able to participate in his sons' scouting and sports activities. Scott and his wife, Heidi, normally split the household chores. Scott testified that he was not able to help with the household chores after the accident, so they had to hire a housekeeper and a lawn service, and Heidi's mother had to help with the laundry.

Heidi admitted that her husband had a few car accidents where he experienced a small amount of pain on a short-term basis, but she stated that he did not have any ongoing pain from those accidents. She testified that between the accident in June 2009 and Scott's surgery in December 2009, his mobility was very limited. Before the accident, she and Scott split the household responsibilities, but after the accident, Scott was not able to do anything. According to Heidi, the Newells had a maid service come twice a month before the accident, and they continued the maid service after the accident.

Despite Scott's condition, he and Heidi went to Mexico on vacation in August 2009, during which he went swimming; he and one of his sons went on a camping trip in October 2009; and the family went to Mexico on vacation in November 2009.

Scott was also able to continue driving to work and testified that other than the five days he took off for the surgery and recovery, the accident did not interfere with his work. He also traveled out of state for work during the period between the accident and his surgery.

Scott returned to Dr. Ferris on August 17, 2009, for a follow-up visit regarding the swollen cervical lymph node. Scott testified that at that time, he was still in constant pain, with the "pain shooting like a lightning bolt down his spine." Dr. Ferris's notes from that visit indicate that Scott did not report any neck or back pain. Scott testified that he did not report neck or back pain to Dr. Ferris because Dr. Ferris's office had informed him that they were no longer treating automobile accident injuries. A CT scan of Scott's chest and neck was performed to evaluate the swollen cervical lymph node. The lymph node was normal.

*Dr Larry Kjeldgaard*

Dr. Kjeldgaard is a board-certified orthopedic surgeon who testified by video deposition at the trial. Dr. Kjeldgaard first saw Scott on September 22, 2009. According to Dr. Kjeldgaard's notes, Scott's chief complaint was "posterior cervical pain," and Scott reported that he was in a rear-collision automobile accident on June 24, 2009, and that he was suffering from a whiplash-type injury to his cervical spine. Scott denied any previous problems, injuries, or accidents to his cervical spine. After a physical exam during which Dr. Kjeldgaard noted that Scott had "diffuse pain and tenderness over the left and right paraspinal musculature of the cervical spine" and restricted mobility in his cervical spine, Dr. Kjeldgaard diagnosed

---

**5.** According to Scott's medical records from CareNow, he was prescribed anti-inflammatories and a muscle relaxer.

Scott with cervical thoracic myofascitis and a "strain sprain of the cervical and the thoracic muscle and the lining of the muscle ... that was secondary to the motor vehicle accident." Dr. Kjeldgaard prescribed physical therapy and noted that if Scott's condition did not improve, Dr. Kjeldgaard would consider ordering an MRI.[6]

Scott next saw Dr. Kjeldgaard on November 3, 2009. According to Dr. Kjeldgaard's notes, Scott's visit was regarding his "cervical neck and radicular pain" and his continued complaint of "left posterior cervical neck pain that radiates into his left shoulder in loss of range of motion." Dr. Kjeldgaard recommended an MRI, which was done on November 6, 2009. Based upon his review of the MRI, Dr. Kjeldgaard felt Scott "had a ruptured disc or ... herniated nucleus pulposus between the fourth and fifth cervical levels in the neck, some enlargement or hypertrophy of the facet or connector joints of the neck and some spurring, spondylosis and narrowing of the nerve holes or the foramen at the C4–5 level." The radiologist's report, however, stated that there was a disc protrusion—not a ruptured or herniated disc—at C4–C5. When asked about the report, Dr. Kjeldgaard said that based upon his interpretation of the MRI, the disc was herniated. Dr. Kjeldgaard also noted that the normal curvature of the spine, called lordosis, was reversed in Scott's spine, which was not normal. He stated that Scott's complaints of pain and lack of mobility were consistent with the MRI. Dr. Kjeldgaard explained that a herniated disc "pushes beyond the back edge of the vertebrae into the space where the spinal cord and/or nerve root is present causing compression on those, and that can generate pain." In his opinion, the disc herniation was caused by the accident.

Dr. Kjeldgaard recommended surgery for a total disc replacement at C4–C5. Dr. Kjeldgaard performed the surgery on December 16, 2009. Dr. Kjeldgaard testified that the surgery confirmed his preoperative diagnosis of a herniated disc at C4–C5. Scott reported improvement of his symptoms to Dr. Kjeldgaard after the surgery. Scott testified that "[t]he restriction [in movement in my neck], the pain, that lightning down my back was gone immediately [after the surgery]." [7] He further testified that he had no pain at the time of trial.

On direct examination, Dr. Kjeldgaard agreed that Scott's herniated disc was the type of injury that could have resulted from the whiplash-type motion of the neck caused by a rear-end automobile collision, even one that occurred at a low speed. He further agreed that it was not unusual for someone who sustains a herniated disc in an automobile accident not to experience significant symptoms immediately after the accident. And the muscle spasms that Scott reported at the CareNow clinic the day after the accident indicated a new injury as opposed to an older, chronic injury. Dr. Kjeldgaard concluded that "[b]ased on the premise that [Scott's] history ... is accurate and truthful, I believe that the injury he suffered on that date was the proximal cause of his problem." It was Dr. Kjeldgaard's opinion that Scott's herniated disc occurred on the day of the accident.

On cross-examination, Dr. Kjeldgaard confirmed that Scott denied any previous

6. Scott admitted that he missed several of the prescribed physical therapy sessions.

7. Scott also testified that after the surgery, the only pain from which he had to recover was the pain caused by the surgery itself and that he missed forty hours of work recovering from the surgery.

problems, injury, or accident to his cervical spine. Dr. Kjeldgaard admitted that he had not reviewed any of Scott's prior medical records, Scott's deposition testimony, an incident report prepared by a police officer that described the accident as low-speed and involving no injuries and mild damage to Scott's car,[8] photographs of the vehicles, the records and x-ray from Scott's June 25, 2009 CareNow visit, or Scott's medical records from Dr. Ferris. Dr. Kjeldgaard admitted that Scott did not tell him about being diagnosed with cervical thoracic myofascial pain syndrome in March 2005, which was Dr. Kjeldgaard's initial diagnosis in September 2009.[9] Dr. Kjeldgaard also conceded that his conclusion that Scott's cervical thoracic myofascitis and strain sprain were caused by the accident was an impression he formed based upon information he received from Scott.

But Dr. Kjeldgaard also testified that he believed Scott's herniated disc was a relatively recent injury because Scott's muscle strength and reflexes were normal when he examined Scott in September 2009. If Scott's herniated disc had been present for a longer period of time, Dr. Kjeldgaard would have expected to see muscle weakness and diminished reflexes in the muscles that were fed by the nerve the disc was pressing against. Dr. Kjeldgaard testified that Scott's June 2009 CareNow records did not change his opinion and that the findings of muscle spasm and Scott's complaints of pain in the records supported his opinion. While Scott's previous injuries were relevant, Dr. Kjeldgaard's sense was that Scott had recovered from those quickly and that the June 2009 acci-

dent caused the herniated disc at C4–C5, which did not get better on its own like Scott's other injuries did. If the herniated disc existed before the accident, Dr. Kjeldgaard would have expected it to cause pain before the accident.

### Dr. Roby Mize

Dr. Mize, who is also board certified in orthopedic surgery, testified as State Farm's medical expert. Dr. Mize admitted that he never physically examined Scott. But he reviewed all of Scott's medical records from 1999 to the time of trial, Rangel's expert report, the parties' depositions, and the incident report prepared by a police officer that described the accident as low-speed and involving no injuries and mild damage to Scott's car.

Dr. Mize testified that the records from Scott's June 25, 2009 CareNow exam indicated there was tenderness in Scott's neck when he moved it, but there was no tenderness upon palpation. Dr. Mize noted that Scott was diagnosed with a muscle spasm but went on to explain that muscle spasms can be under a patient's control and there are a lot of different causes of muscle spasms, the most common of which is not injury. The most common cause is an overly tight or overly tense muscle. Dr. Mize did concede, however, that a minor car accident could cause muscle spasms. Dr. Mize noted that the CareNow x-ray of Scott's cervical spine was "essentially normal" and showed no evidence of any type of acute injury. Dr. Mize also pointed out that Scott's records from the CareNow clinic stated that he was instructed to return to the clinic in seven to fourteen days if his condition did

---

8. Dr. Kjeldgaard was shown an "Incident Detail Report" during his deposition, but the report was not admitted into evidence at the trial.

9. Dr. Kjeldgaard explained that in layman's terms, cervical thoracic myofascial pain syndrome means "chronic soreness and tenderness about the muscles and lining of the muscles in the back of the neck in between the shoulder blade area."

not improve or return immediately if his condition worsened. Scott did not return.

Dr. Mize also reviewed Dr. Ferris's records, which began in 1999. Dr. Mize noted that Dr. Ferris's records indicated that Scott had instances of neck pain in 1999, 2002, and 2005. He also noted that Dr. Ferris had diagnosed Scott with cervical thoracic myofascial syndrome in 2005, which Dr. Kjeldgaard also diagnosed him as having in September 2009. Dr. Mize reviewed the CT scan taken in August 2009. The CT scan was basically normal, but it showed some chronic degenerative changes in Scott's cervical spine that, in Dr. Mize's opinion, had been there for much longer than two months. Dr. Mize did not see any herniated discs but did see slight disc bulges or protrusions at four out of the six levels. Dr. Mize thought it was "extremely significant" that Scott did not report his "lightning bolt" pain to Dr. Ferris at Scott's August 2009 appointment because in his opinion, if Scott was in pain, he would have told his long-time physician.

Dr. Mize examined Dr. Kjeldgaard's notes from Scott's September 2009 visit. Dr. Mize testified that when a patient presents with a neck problem, the patient's history of prior neck injuries or problems is very significant. Dr. Mize also disagreed with Dr. Kjeldgaard's assessment that Scott's herniated disc was a recent injury because it had not caused any problems. According to Dr. Mize, a herniated disc putting pressure on a spinal nerve would have caused rapid and dramatic changes almost immediately, including muscle atrophy and loss of reflexes. In Dr. Mize's opinion, there was no objective evidence in September 2009 to show that there was any nerve pressure.

Dr. Mize also reviewed the November 2009 MRI ordered by Dr. Kjeldgaard and the radiologist's report. The radiologist's report stated that at C4–C5 a "[l]oss of disc height is present" and that there was "a [b]road 2 mm disc protrusion with a 3mm left posterolateral component," which caused "mild central canal stenosis and contribute[d] to moderate left and mild right neural foraminal narrowing with uncinate hypertrophy." Dr. Mize explained that the loss of disc height was the result of deterioration or degeneration of the disc over time and that the disc protrusions were "very, very small." The "mild central canal stenosis" meant the spinal canal had narrowed but was not touching the spinal cord. Dr. Mize further explained that the disc protrusions at almost every level of Scott's cervical spine, not the June 2009 accident, caused the stenosis. He also opined that the stenosis was not causing Scott any problems. The disc protrusion also contributed to the narrowing of the neural foramen, which are holes through which nerves run. Dr. Mize stated that the MRI showed that these nerves were not being compressed or touched. The radiologist also did not note any nerve compression in his report.

Dr. Mize testified that Scott had a protruded disc at C4–C5 and that "[t]here was no evidence whatsoever that he had a herniated disc" there. Dr. Mize explained that a herniated disc is a protruding disc that has progressed to the point where the annulus, or the capsule, surrounding the disc tears and the disc herniates out and puts pressure on the nerve. He observed no defect or tear in the annulus at C4–C5 or abnormal fluid collection there. The radiologist also described the disc as protruding instead of herniated. According to Dr. Mize, there was no objective evidence on the MRI or the CT scan that Scott had a herniated disc and nothing objective indicated that Scott was injured in the June 2009 automobile accident.

When questioned about the reversal of Scott's lordotic curve noted in both the

CareNow x-ray and by Dr. Kjeldgaard, Dr. Mize testified that he did not attach any clinical significance to it because it was probably caused by the considerable degenerative arthritis in Scott's spine from the base of his skull to the top of his shoulders. Dr. Mize was emphatic that Scott's degenerative arthritis was not caused by the accident but developed over several years. Dr. Mize further testified that based upon Dr. Kjeldgaard's physical examinations of Scott in September and November 2009 and the CT scan and MRI—both of which revealed no objective evidence that would indicate any compression or pressure on the nerve—Scott's disc replacement surgery was not indicated because there was no objective, valid evidence to perform the surgery. In fact, "there was no valid objective indication for performing any kind of surgery." In Dr. Mize's opinion, there was no evidence that the June 2009 accident caused an injury that required the disc replacement surgery. The fact that Scott testified that he was pain free after the surgery did not negate the fact that he did not need surgery to start with.

On cross-examination, Dr. Mize stated that it was his opinion that Scott's injury, if any, was limited to a minor, soft-tissue strain of the neck, which was the type of injury that would completely heal in two to four weeks without treatment. Dr. Mize did not consider Scott's muscle spasm diagnosed at the CareNow clinic the day after the accident to be a significant objective finding. He also maintained that Scott did not have a herniated disc in his neck and that Scott's surgery was unnecessary.

Dr. Mize conceded that there was no evidence in Scott's medical records that he was suffering from any kind of neck pain from 2005 through 2009 and that there was no indication of neck pain or muscle spasm

during Scott's annual physical two days before the accident. Dr. Mize confirmed that Scott had "extensive chronic degenerative deterioration throughout the cervical spine," and even though Scott had a moderate amount of degenerative changes for a man his age, the chronic degenerative deterioration in his cervical spine was "out of the ordinary for a 40–year–old." According to Dr. Mize, Scott's previous neck injuries contributed to the development of his chronic degenerative arthritis. Dr. Mize admitted that Scott's preexisting conditions in his spine made him more fragile and vulnerable to injury and that trauma can make a degenerative condition begin to hurt when it did not before.

Dr. Mize stated that it was quite common for a person involved in an automobile collision to not feel pain until several hours after the accident. He agreed that the physician's assistant who examined Scott at the CareNow clinic the day after the accident determined that Scott had muscle spasms in his neck. Dr. Mize testified that a muscle spasm is both an objective and a subjective finding. A muscle spasm is a subjective finding because the patient has control over the tense muscles in the neck. Scott's tension could have come from another source.

When asked about the reversal of the normal lordotic curve of the spine noted in the CareNow x-ray, Dr. Mize admitted that the finding is frequently an indication of muscle injury, especially if found following a traumatic event and in conjunction with muscle spasm. Dr. Mize also conceded that the reversal of the normal lordotic curve of the spine is an objective finding. But Dr. Mize testified that reversal of the normal lordotic curve is frequently found on x-rays with no indication of trauma. Among the many causes of reversal of the normal lordotic curve are increased muscle tension, muscle spasms,

and disease processes, such as degenerative arthritis, which was, in all probability, causing Scott's straightening of the spine. Dr. Mize further testified that the second x-ray finding—posterior narrowing of C4–C5 disc space—is rarely an indication of an acute injury to the disc space, but it is an indication of chronic degenerative arthritis. In all probability, the posterior narrowing of the C4–C5 disc space had nothing to do with the accident. Dr. Mize stated that there was no objective evidence of a recent injury in the November 2009 MRI.

Dr. Mize testified that Scott had chronic degenerative arthritis, which can cause pain. Dr. Mize agreed that the fact that Scott went through with disc replacement surgery was a strong indication that he was experiencing pain prior to surgery. Dr. Mize explained that during the surgery, Dr. Kjeldgaard removed some bone spurs at C4–C5 from Scott's spine. These spurs were not caused by the accident but by longstanding degenerative arthritis. The removal of these bone spurs could have contributed to Scott being pain-free after the surgery.

*The jury's findings, judgment, and motion for new trial*

The jury awarded Scott $198 for reasonable and necessary past medical care for injuries that resulted from the accident but awarded no damages for past physical pain and mental anguish, past and future disfigurement, past and future physical impairment, and lost wages. The jury awarded Heidi no damages for past loss of household services. After applying offsets and credits totaling $67,500 for monies paid to the Newells by Cox's insurance policy and by State Farm under the policy's personal injury protection and underinsured motorist provisions,[10] the trial court entered a

take-nothing judgment against the Newells.

The Newells moved for a new trial, arguing that the jury's finding of no damages for Scott's past pain and mental anguish was against the great weight and preponderance of the evidence and was manifestly unjust in light of the jury's award of $198 for Scott's past medical care. The trial court granted the new trial. State Farm filed a motion to reconsider, and the Newells filed a motion requesting that the trial court enter a substitute order granting their motion for new trial setting forth the specific grounds for granting them a new trial. The trial court implicitly denied State Farm's motion for reconsideration and entered a substitute order granting the Newells' motion for new trial, which reads in pertinent part as follows:

> The court grants the New Trial because the jury's finding that Plaintiffs [sic] sustained no compensable physical pain and suffering is against the great weight and preponderance of the evidence and is manifestly unjust in light of the jury's other finding that the Plaintiff sustained a physical injury in the incident in question. Additionally there was objective evidence of [Plaintiff's] injury, such as a thorough exam of the neck showing no muscle spasm a few days before the collision in question, the presence of muscle spasm on the day after the collision, as well as x-ray's [sic] showing reverse of the normal curvature of the spine.

The trial court entered an agreed order abating the case pending this court's ruling on State Farm's mandamus petition.

## II. Standard of Review

To be entitled to mandamus relief, a relator generally must demonstrate

---

**10.** The parties stipulated to the amount of offsets and credits.

(1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex.2011) (orig.proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex.2005) (orig.proceeding). "In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *In re Sanders*, 153 S.W.3d 54, 56 (Tex.2004) (orig.proceeding). In other words, under an abuse-of-discretion standard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex.2009) (orig.proceeding). A trial court's order granting a new trial may be reviewed by an appellate court in a mandamus proceeding. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 755–59 (Tex.2013) (orig.proceeding); *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex.2012) (orig.proceeding).

### III. Requirements for an Order Granting a New Trial

◼ While Texas trial courts historically have enjoyed broad discretion in granting new trials, that discretion is not without limits. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210, 212 (Tex.2009) (orig.proceeding) (stating that a trial court's "significant discretion" to grant a new trial "should not, and does not, permit a trial judge to substitute his or her own views

for that of the jury without a valid basis"). The trial court's order granting a new trial must be "understandable," "reasonably specific," *see id.* at 213, "cogent," "legally appropriate," "specific enough to indicate that the trial court did not simply parrot a pro forma template," and issued "only after careful thought and for valid reasons," *see United Scaffolding*, 377 S.W.3d at 688–89. In the context of a mandamus proceeding, an appellate court may scrutinize new trial orders to ensure compliance with these requirements, and it also may review the correctness or validity of the trial court's reasons for granting a new trial. *See Toyota Motor Sales*, 407 S.W.3d at 757–58. A trial court's articulated reasons for granting a new trial must be supported by the underlying record; if not, the new trial order will not survive mandamus review. *See id.* at 758 ("Appellate courts must be able to conduct merits-based review of new trial orders. If, despite conformity with the procedural requirements of our precedent, a trial court's articulated reasons are not supported by the underlying record, the new trial order cannot stand.").

◼ As to the trial court's order granting the Newells a new trial, we conclude that the trial court provided an understandable, reasonably specific explanation of its reason for setting aside the jury's verdict. *See id.* at 757; *Columbia Med. Ctr.*, 290 S.W.3d at 213; *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 155–56 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. pending] ). The trial court's reason for granting a new trial is facially sound; it is legally appropriate and specific enough to indicate that the trial court did not "simply parrot a pro forma template" but arrived at its conclusion based upon specific evidence presented at trial. *See Toyota Motor Sales*, 407 S.W.3d at 756–57; *United Scaffolding*, 377 S.W.3d

at 688–89; *Wyatt Field Serv.,* 454 S.W.3d at 155–56.

Having determined that the new trial order is facially sound, we must determine whether the trial court's stated reasons for granting a new trial are valid and correct by conducting a careful "merits review" of the record. *See Toyota Motor Sales,* 407 S.W.3d at 759 ("Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough; the reasons must be valid and correct."). In other words, we must decide whether the trial court correctly concluded that the evidence was factually insufficient to support the jury's finding that Scott "sustained no compensable physical pain and suffering." *See id.* at 757–58. We analyze this issue under the factual-sufficiency standard of review. *See In re Athans,* 478 S.W.3d 128, 133–34 (Tex.App.—Houston [14th Dist.] 2015, orig. proceeding) (op. on reh'g); *In re E.I. duPont de Nemours & Co.,* 463 S.W.3d 80, 85 (Tex.App.—Beaumont 2015, orig. proceeding); *Wyatt Field Serv.,* 454 S.W.3d at 152–53; *In re Zimmer, Inc.,* 451 S.W.3d 893, 905–06 (Tex. App.—Dallas 2014, orig. proceeding); *In re Baker,* 420 S.W.3d 397, 402–03 (Tex. App.—Texarkana 2014, orig. proceeding).

## IV. Factual Sufficiency Standard of Review

In reviewing an order granting a new trial, we must be mindful of the different roles of the jury, the trial court, and the appellate court. As stated by one of our sister courts:

In a mandamus proceeding, we may not substitute our judgment for that of the trial court. But neither may the trial court substitute its judgment for that of the jury in granting a new trial. The method for ensuring that the trial court does not substitute its judgment for that of the jury, is [for the appellate court] to confirm that the court's reasons for granting a new trial are valid and correct, i.e., supported by the trial record. *Wyatt Field Serv.,* 454 S.W.3d at 152 (citations omitted). Thus, after a review of the record of the trial, if we determine that the record does not support the trial court's stated reasons for granting the motion for new trial, then the trial court abused its discretion by granting a new trial based on factual sufficiency. *See id.* at 152–53.

In a factual-sufficiency review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). When a party attacks the factual sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). A reviewing court considers and weighs all the evidence, and it is proper to set aside the jury finding only if the finding is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Maritime Overseas Corp.,* 971 S.W.2d at 406–07.

The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). When presented with conflicting testimony, the jury may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *Athans,* 478 S.W.3d at 134 (citing *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986)). Neither the trial court nor this court may substitute its own judgment for that of the jury, even if the court would reach a different answer on the evidence.

*Maritime Overseas Corp.,* 971 S.W.2d at 407. The amount of evidence necessary to show that factually sufficient evidence supports a jury finding is far less than the amount of evidence necessary to justify a conclusion that the finding is so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust. *See GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## V. Analysis

In two related issues, State Farm challenges the trial court's order granting the Newells a new trial. First, State Farm contends the trial court abused its discretion by ordering a new trial. Second, State Farm asserts that the trial court's conclusion that the jury's award of no damages for past physical pain and suffering was against the great weight and preponderance of the evidence was incorrect, thereby making the trial court's articulated reasons for granting a new trial invalid and incorrect. Because we consider State Farm's second issue as an interrelated subpart of its first issue, we address both issues as one.

We examine the evidence the trial court identified in its new trial order, as well as the remaining evidence in the record before us to determine if the trial court's stated reasons in its order support granting the Newells a new trial. *See Toyota Motor Sales,* 407 S.W.3d at 758; *E.I. du-Pont,* 463 S.W.3d at 87. The trial court concluded that the evidence was factually insufficient to support the jury's finding that Scott sustained no compensable physical pain and suffering based upon the jury's finding that Scott sustained a physical injury in the accident and based upon objective evidence of Scott's injury, specifically the exam of Scott's neck a few days

before the accident showing no muscle spasm, the presence of a muscle spasm the day after the accident, and an x-ray showing a reversal of the normal curvature of the spine.

▮▮▮ Generally, the jury has great discretion in considering evidence on the issue of damages. *Grant v. Cruz,* 406 S.W.3d 358, 363 (Tex.App.—Dallas 2013, no pet.) (citing *McGalliard,* 722 S.W.2d at 697; *Lanier v. E. Founds., Inc.,* 401 S.W.3d 445, 454–55 (Tex.App.—Dallas 2013, no pet.)). Matters of pain and mental anguish are necessarily speculative, and it is particularly within the jury's province to resolve these matters and decide the amounts attributable thereto. *Id.* at 363 (citing *Lanier,* 401 S.W.3d at 454–55). When there is uncontroverted, objective evidence of an injury and the causation of the injury has been established, appellate courts are more likely to overturn jury findings of no damages for past pain and mental anguish. *Id.* (citing *Lanier,* 401 S.W.3d at 455); *see also Blizzard v. Nationwide Mut. Fire Ins. Co.,* 756 S.W.2d 801, 805 (Tex.App.—Dallas 1988, no writ). However, where the evidence of pain is conflicting, scant, or more subjective than objective, appellate courts are generally more reluctant to determine a jury finding of no damages is contrary to the great weight and preponderance of the evidence. *Grant,* 406 S.W.3d at 363–64 (citing *Lanier,* 401 S.W.3d at 455; *McGuffin v. Terrell,* 732 S.W.2d 425, 428 (Tex.App.—Fort Worth 1987, no writ) (finding when there was no objective evidence of injury, jury could resolve inconsistencies in evidence, determine plaintiffs injuries from accident were minimal, and award no damages for pain and suffering despite awarding damages for past medical expenses)).

▮▮▮ Additionally, the mere fact of injury does not prove compensable pain and mental anguish. *Id.* at 364; *Blizzard,*

756 S.W.2d at 805; *see also Lanier*, 401 S.W.3d at 454–55; *Lamb v. Franklin*, 976 S.W.2d 339, 341–42 (Tex.App.—Amarillo 1998, no pet.). "[A] damage award for physical pain is not always mandated when medical expenses are awarded." *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 398 (Tex.App.—Houston [14th Dist.] 2010, no pet.). For an undisputed injury that is less serious and accompanied only by subjective complaints of pain, a jury may reasonably believe that the injured party should be compensated "for seeking enough medical care to ensure that [the] injury was not serious" yet also conclude the injured party "never suffered pain warranting a money award." *Blizzard*, 756 S.W.2d at 805; *see also McGuffin*, 732 S.W.2d at 428 (stating that "evidently the jury found appellant's injury so minimal as to not warrant an award for past pain and suffering" despite the jury's award of medical expenses for treatment of muscle spasms); *Chadbourne v. Cook*, No. 05–99–00353–CV, 2000 WL 156955, at *2 (Tex. App.—Dallas Feb. 15, 2000, no pet.) (not designated for publication) (stating that "the jury could reasonably conclude any pain and suffering [one of the plaintiffs] endured was too negligible to warrant monetary compensation" despite the jury's award of medical expenses for treatment of his nose injury). Moreover, when there is conflicting evidence of the injury's cause or an alternative explanation for the injured party's reported pain, appellate courts have upheld zero damage findings for physical pain despite the jury finding that the injured party is entitled to damages for medical expenses. *Grant*, 406 S.W.3d at 364; *Enright*, 330 S.W.3d at 398; *see also Lanier*, 401 S.W.3d at 455 ("When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages."); *Hyler v. Boytor*, 823 S.W.2d 425, 427–28 (Tex.App.—Houston [1st Dist.] 1992, no writ) (upholding zero damages finding for pain and suffering despite award for medical expenses; jury heard evidence of alternative causes for plaintiff's lumbar sprain and spinal injury).

As pointed out by State Farm in its mandamus petition, the trial court did not grant a new trial on the grounds that the evidence was factually insufficient to support the jury's finding that Scott did not sustain any compensable mental anguish. Thus, we do not address the mental anguish category of damages. The jury awarded Scott $198 as a "reasonable expense of necessary medical care incurred in the past" to compensate him for his injuries that resulted from the accident. Given this finding, the jury believed that Scott suffered some injury as a result of the accident and reasonably sought enough medical care to ensure that the injury was not serious. The jury did not award Scott damages for his subsequent treatment and surgery, even though it heard evidence that Scott incurred between approximately $53,000 and $54,000 in medical expenses. As explained below, the jury could have reasonably believed, based on the evidence, that Scott did not suffer any physical pain and suffering as a result of the accident.

It was undisputed that the accident occurred at a very low speed, causing less than $800 in damage to Scott's car and no damage to Cox's car. The jury heard conflicting evidence about the severity of Scott's injuries and whether his injuries were caused by the collision. Scott was instructed to return to the CareNow clinic in seven to fourteen days if his condition did not improve or return immediately if his condition worsened, but there was no evidence that he returned to the clinic.

While he and his wife testified that he was in pain in the months following the accident, nearly three months elapsed between the accident and when Scott sought treatment from Dr. Kjeldgaard. During that time, Scott went on vacation to Mexico and saw Dr. Ferris in August 2009 to follow-up for a cervical lymph node but did not mention his neck pain to the doctor. Scott did not attend all of the physical therapy sessions ordered by Dr. Kjeldgaard, and he went camping and took another trip to Mexico in the intervening months between his initial appointment with Dr. Kjeldgaard and his surgery. Until Scott had surgery in December 2009, he did not miss any work as a result of his injuries and traveled out of state for work.

While Dr. Kjeldgaard testified that the accident caused the injury that necessitated Scott's surgery, Dr. Mize testified that it did not.[11] It was Dr. Kjeldgaard's opinion that Scott's neck pain was the result of a herniated disc that was caused by the accident. But Scott did not inform Dr. Kjeldgaard of his history of neck injuries or review Scott's medical records regarding those problems. Dr. Mize reviewed all of Scott's medical records. In his opinion, the CareNow x-ray was normal and showed no signs of acute injury. The CT scan and the MRI scan, however, showed degenerative changes in Scott's cervical spine that had been present longer than two months. Dr. Mize observed no herniated discs and stated that the CT scan and the MRI did not indicate any compression or pressure on the nerve. Dr. Mize opined that there was no objective evidence in Scott's medical records that he was injured in the accident and there was no objective, valid evidence that Scott needed surgery. It was Dr. Mize's opinion that Scott had chronic, degenerative arthritis that was caused not by the accident but by his previous neck injuries; the arthritis was causing his pain.

Scott's CareNow records reflected the presence of a muscle spasm the day after the accident, which the Newells argue is uncontroverted, objective evidence of an injury. It was not undisputed, however, that the muscle spasm was caused by the accident. Dr. Mize testified that he did not consider the muscle spasm to be a significant objective finding. It was his opinion that muscle spasms can be under a patient's control and there are a lot of different causes of muscle spasms, the most common of which is not injury; the most common cause of muscle spasms is an overly tight or overly tense muscle. Moreover, the accident occurred at a low speed and caused minor property damage, and Scott had a history of prior neck injuries. With respect to the reverse of the normal curvature of the spine, Dr. Mize testified that it was caused by Scott's degenerative arthritis, which Scott had in his spine from the base of his skull to his shoulders.

It was the jury's duty to resolve any fact issues at trial, and the trial court may not substitute its judgment for that of the jury. *See United Scaffolding,* 377 S.W.3d at 688; *Columbia Med. Ctr.,* 290 S.W.3d at 212. Here, the jury reasonably could have concluded that Scott's ongoing complaints

11. In their response, the Newells refer to Dr. Mize as State Farm's "well-compensated medical expert," pointing out that he was paid approximately $35,000 to testify in this lawsuit, earns approximately forty percent of his annual income, or approximately $200,000, from testifying as an expert, and is able to testify favorably for the party who consults him in approximately ninety percent of the cases he reviews. The Newells elicited this information from Dr. Mize on cross-examination. As we pointed out above, the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery,* 116 S.W.3d at 761.

of pain were not proximately caused by the accident and did not rise to the level of compensable physical pain and suffering. Based upon our review of the record, given the presence of conflicting evidence, the jury's finding that Scott sustained no compensable physical pain and suffering was not so clearly against the "great weight and preponderance of the evidence" as to be clearly wrong and unjust. Thus, the record does not support this ruling, and the trial court abused its discretion by granting a new trial for this reason. *See Toyota Motor Sales,* 407 S.W.3d at 758; *Wyatt Field Serv.,* 454 S.W.3d at 149. Accordingly, we sustain both of State Farm's issues.

## VI. Conclusion

When, as here, the trial court's reasons for granting the motion for new trial are invalid, a remedy by appeal is inadequate and the relator is entitled to mandamus relief. *See Toyota Motor Sales,* 407 S.W.3d at 758. Accordingly, we conditionally grant State Farm's petition for writ of mandamus and direct the trial court to set aside its January 30, 2015 order granting the Newells' motion for new trial and to reinstate its September 30, 2014 final judgment. We are confident the trial court will comply, and the writ will issue only if it fails to do so.