

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00207-CV

———————————————

KHASIA WILSON, Appellant

V.

GEORGE MURPHY, Appellee

---

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-331600-22

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

In this car-wreck case, Appellant Khasia Wilson was injured after her vehicle was rear-ended by Appellee George Murphy. Wilson sued Murphy, and the case proceeded to a jury trial where Wilson obtained a verdict in her favor and was awarded $15,879.55 in damages. Wilson raises two issues on appeal: (1) that the jury's awards of zero dollars for her past physical pain and past mental anguish were against the great weight and preponderance of the evidence and (2) that the trial court abused its discretion by excluding the expert testimony of her chiropractor, Dr. Michael Davis. We will affirm.

## I. BACKGROUND

### A. RELEVANT PROCEDURAL BACKGROUND

The car wreck at the center of this case occurred on April 12, 2021, and Wilson sued Murphy on January 25, 2022, for negligence stemming from the wreck. She requested damages for property damage and also for past and future medical expenses, earnings, physical pain and suffering, mental anguish, and impairment. In an agreed scheduling order entered on June 17, 2022, the trial court set the following dates and deadlines: (1) Wilson's deadline to designate expert witnesses on October 27, 2022; (2) end of discovery period on January 27, 2023; and (3) trial on February 27, 2023.

On January 11, 2023, Wilson filed a verified motion for continuance of the trial setting and scheduling order deadlines, stating that her counsel had five other cases set

2

for trial on February 27, 2023. She also stated that the parties had "completed the investigation and discovery phase" and that the case would "benefit from mediation." Wilson requested a 180-day continuance.

On February 9, 2023, Murphy filed his witness list. The record is unclear as to whether Wilson also filed a witness list before trial,[1] though she did supplement her Rule 194 disclosures on February 9, 2023. These disclosures referenced Dr. Davis within a narrative description of the various medical treatments that Wilson had received after the wreck but did not specifically list him as a person who had knowledge of relevant facts or as a potential witness for trial. Then, on February 16, 2023, Wilson filed an amended motion for continuance, in which she explained that her counsel had "recently had a large staff turnover at his office and calendaring issues arose," which "resulted in a missed expert deadline and late discovery supplementation."[2] She requested a 180-day continuance so that she could "supplement and complete discovery."

Murphy opposed the continuance and any alteration of the discovery deadlines, chiefly because of his age. He was almost 90 years old and looking to resolve the

---

[1]There is no witness list from Wilson in the appellate record, and Murphy claims in his appellee's brief that she did not file one before trial. However, at a hearing on the first day of trial, the trial court indicated that Wilson may have filed a witness list on February 13, 2023, that included, among others, Dr. Michael Davis, a chiropractor at Health First Chiropractic Injury & Pain Center (Health First), where Wilson had received treatment.

[2]Wilson concedes that she did not timely designate any experts.

3

case, which had "brought stress and anxiety to him and his family." He also argued that allowing the reopening of discovery and expert designation "would allow [Wilson] to present an entirely *new* and *different* case at trial, which [would] cause [Murphy] to incur new significant expenses in this matter." [Emphasis in original.]

At a February 22, 2023 hearing on Wilson's continuance motion, the parties agreed to move forward with trial as scheduled with the stipulation that Wilson's life care planner, Dr. Thomas Garzillo, would be allowed to testify as an expert.[3] No discussion was had or agreement made at the hearing as to any other experts that Wilson desired to use at trial—including Dr. Davis—and her continuance motion was not explicitly ruled on at that time.

The issue of Wilson's expert designations was raised again on the first day of trial. Wilson's counsel stated that it was his understanding after the February 22 hearing that he could call Dr. Garzillo and other experts to testify—including Dr. Davis, who would testify about the reasonableness of the costs of care that Wilson had received at Health First.[4] The trial court and Murphy's counsel both disagreed

---

[3]At the hearing, Murphy's counsel told the trial court she only knew of Dr. Garzillo's existence as a possible expert "through a demand letter that was sent directly to [Murphy's insurance company] that was never CC'd to us." However, she expressed Murphy's strong desire to proceed with trial as scheduled and stated that, "If that means allowing [Dr. Garzillo to testify], we would agree to that."

[4]Wilson's counsel explained that, even though the Health First billing records were attested-to (by another official at Health First) and, thus, self-authenticated, Dr. Davis's testimony was necessary to refute controverting affidavits that Murphy had filed disputing the reasonableness of the Health First charges.

with this understanding. The trial court explained that Murphy had waived any issue related to Dr. Garzillo's having not been designated as an expert but had not waived the issue as to Dr. Davis or any other potential experts. Wilson's counsel argued that, even so, Murphy could not claim to have been surprised or prejudiced by Dr. Davis's untimely designation because his name had appeared "all over" the medical records delivered to Murphy in discovery.[5] To that, Murphy's counsel responded, "[W]e don't even know what [Dr. Davis] is going to say. I mean, we don't know what opinions he's going to give. . . . I don't know anything about Michael Davis. I've never heard that name."

The trial court ordered that Dr. Davis was excluded from testifying as an expert because he had not been properly designated. That evening, Wilson filed her first expert designation, which included Dr. Davis. The next day, February 28, 2023, Wilson reurged her motion for continuance of the trial and expert designation deadline. The trial court denied the motion, and Wilson called Dr. Davis to make an offer of proof as to what his testimony would be if submitted to the jury.

Dr. Davis testified that he was a chiropractor at Health First. He said that he had never personally treated Wilson but was familiar with her case and her medical

---

[5]Of the more than 300 pages of medical records appearing in the appellate record, we see Dr. Davis's name on only two pages, both from Wilson's initial appointment at Health First on April 15, 2021: (1) in the header of a referral form alongside the names of two other doctors that work at Health First and (2) on an assignment of benefits form.

5

and billing records. After summarizing the treatment provided to Wilson, Dr. Davis opined that her treatment and billed charges were reasonable and necessary. Wilson then reurged her motion to allow Dr. Davis to testify as an expert. The trial court again denied her motion.

## B. RELEVANT TRIAL EVIDENCE

At trial, Wilson's sister, Lowanna Jones, testified that Wilson had become less active after the car wreck with Murphy. She said that Wilson used to enjoy trips to the lake and doing yard work but that the pain from the wreck had kept her from doing those things. Also, Wilson had difficulty getting comfortable while sitting and was generally more limited in her everyday activities due to the wreck. However, Jones said that, though Wilson still had good days and bad days, she had gotten "her joy back" and had continued to improve since the wreck. This included that Wilson was now able to complete her work-from-home job, though with modified seating.

Terry Pimpleton, Wilson's friend, also testified that Wilson had complained of pain after the wreck and had been less active because of it.

Wilson testified that the wreck occurred as she was waiting to turn right at a yield sign. She said that she came to a stop at the yield sign behind the crosswalk to check for traffic and that she was "bumped" from behind by Murphy. The impact was strong enough to push her car through the crosswalk with her brake applied, but she did not hit her head, lose consciousness, or suffer any cuts or bruises; her airbag

did not deploy, and her car was still operable. The damage to her vehicle consisted mainly of a dented bumper and damage to four sensors underneath the bumper.

First responders recommended that Wilson take an ambulance to the hospital due to her elevated blood pressure. At the hospital, Wilson complained only of having neck pain and a headache. However, she had full range of motion in her neck, and x-rays showed no abnormalities. A CT-scan performed on her neck showed "no radiological evidence of acute" injury. Within three days of the wreck, Wilson says that she started experiencing additional pain in her neck, shoulder, arm, back, and leg. She met with an attorney who advised her to visit a chiropractor at Health First and to also see a doctor at Momentum Spine and Joint (Momentum), a pain management clinic.

On her first visit to Health First for chiropractic care, Wilson was x-rayed again, which showed that she had scoliosis in her middle back but that her shoulders were unremarkable. In total, Wilson visited Health First more than sixty times between April 2021 and April 2022. Initially, Wilson was treated for about four months with only electrical stimulation, ultrasounds, and hot and cold packs. She then took a six-month break from visiting Health First before returning in February 2022. After that, her treatment appears to have been similar except that she added minor exercises and occasional manipulations and adjustments to her regimen. The report from her last visit at Health First in April 2022 indicates that Wilson was still complaining of pain in her neck, shoulder, arm, and back.

Wilson visited Momentum about a dozen times between April 2021 and May 2022.[6] Her treatment included occasional steroid injections and MRIs and prescription pain medications. The reports from her last visits at Momentum in May 2022 indicate that Wilson's pain levels were "mild" and that she had reported improved pain in her neck and back. One note stated that "despite residual pain [Wilson] has, she does feel closer to her functional baseline and pain is more tolerable than before." At her final visit at Momentum, her doctor noted this improvement and recommended that Wilson "defer any further interventions" at Momentum while also recommending that she continue with chiropractic and other therapies to deal with any lingering pain.

Wilson also visited her primary care physician (PCP) several times after the wreck. The first of these visits occurred in September 2021—about five months after the wreck—at which Wilson complained of sciatic pain, hip pain, and neck pain. The records from this visit discuss the events of the wreck and note that Wilson had not felt this pain immediately after the wreck but that it had started sometime later. One note even indicates that Wilson's hip and neck pain did not start until September 2021.

Other than at the September 2021 visit, Wilson's PCP records do not show that she complained again of having any pain associated with the wreck. Wilson

---

[6]As with her visits to Health First, Wilson also took a six-month break from visiting Momentum in the middle of her treatment.

testified that her pain came and went and that she would only report symptoms that she was experiencing on the day that she visited her PCP. Instead, it appears that her PCP visits focused largely on treating her diagnoses of obesity, high blood pressure, and diabetes. At an August 2022 visit, her PCP noted that Wilson had started a new "hybrid" job, that her anxiety was "better," and that she was swimming "every few days."

Wilson testified that she had been in one previous auto accident in 2014 in which another car backed into her at a restaurant. She said that she suffered no bodily injuries from that accident but that her car required repairs. Murphy sought to impeach this testimony by first questioning Wilson why she had testified at a deposition that she had never been in any other automobile accidents. Murphy then entered into evidence insurance records purporting to show that Wilson had been in two previous auto accidents: the one in 2014 and another with a date of loss from 2013. Wilson intimated that she may have forgotten about the previous wreck while being deposed and explained that the 2013 and 2014 insurance records were actually from the same accident that occurred at the restaurant.

Wilson also testified that she had been in a four-wheeler accident[7] in which the four-wheeler "flipped" onto Wilson and her son. She suffered a hairline fracture in her arm from that accident.

_____

[7]It is not clear from the record when the four-wheeler accident occurred.

9

Wilson testified that she had been forced to miss about ten days of work due to the wreck. She said that her pain persisted, that it had made her less active than before the wreck, and that it had taken "the little things" from her life. She was unable to sit or stand for long periods of time and she could not cook, clean, shop, or attend her son's football games as much as she used to. For these reasons, she would need future medical care such as injections and massages to alleviate her pain.

Testifying via deposition, Murphy admitted that he had acted negligently but also stated that it appeared to him that Wilson had intentionally caused the wreck by stopping at the yield sign: "I have no reason – no idea why she stopped." Murphy also said that he believed that Wilson had embellished her injuries at the scene of the wreck because he had hit Wilson's car "very softly." He elaborated that he had just barely hit her car but that "she acted like she had been in a fast, busy wreck" and that "she wouldn't walk" after it occurred. According to Murphy, he had taken his foot off the brake pedal and turned to look for traffic; his car then rolled forward and hit Wilson's car at a speed of one or two miles per hour.

Finally, Dr. Garzillo—Wilson's life care planner and a licensed chiropractor—testified as an expert. Dr. Garzillo did not treat Wilson directly but viewed her medical records to calculate her future medical expenses. He explained that Wilson's records showed that she had multiple herniated discs in her back and neck.[8] He

_____

[8]Garzillo's testimony related to Wilson's herniated discs was drawn from two scans performed on her spine. The first was a CT-scan of her lower back performed

conceded that obesity has been shown to play a role in causing lower-back disc herniations but not in neck herniations. He also testified that it was common for car-wreck injuries not to present immediately but to arise later and opined that the treatment Wilson had received was reasonable for her conditions.

Dr. Garzillo said that Wilson's condition would only worsen as she aged and that she would never be completely cured. According to Dr. Garzillo, Wilson would suffer not from constant pain in the future but from "flare-ups" that would increase as time went on. In his estimation there was a reasonable probability that Wilson would need future medical care and that her care would cost between $18,000 and $156,000. This care would likely not be immediately necessary[9] and would consist of yearly x-rays, between six and twelve chiropractic manipulations per year, and physical therapy.

## C. VERDICT AND JUDGMENT

After the close of evidence, Wilson moved for and was granted a directed verdict on the issue of Murphy's negligence. The jury then found that Wilson had not also been negligent and awarded her damages as follows:

on April 26, 2021—about two weeks after the wreck—showing that Wilson had two herniated discs in her back. The second was an MRI of her neck performed on April 26, 2022—more than a year after the wreck—showing that Wilson had three herniated discs in her neck.

[9]Based on the relevant research, Dr. Garzillo explained that Wilson's "post-traumatic accelerated degeneration" would likely present initially between five and fifteen years after the wreck.

11

- Past medical expenses: $6,879.55.[10]

- Future medical expenses: $5,875.76

- Past loss of earning capacity: $3,124.24.

It awarded her nothing for the remaining damages categories, including past physical pain and mental anguish. The trial court entered judgment on this verdict on April 14, 2023. Wilson filed a timely motion for new trial, raising many of the same arguments that she raises on appeal. The trial court denied this motion, and Wilson appealed.

## II. Discussion

## A. Jury's Zero-Damages Awards

In her first issue, Wilson argues that the jury's awards of zero dollars for her past physical pain and past mental anguish were against the great weight and preponderance of the evidence. In her view, the evidence of her past pain and mental anguish was objective and unconflicted—particularly in light of her diagnoses, the jury's award of past and future medical expenses, and Dr. Garzillo's testimony regarding her future medical needs—thus making the jury's award clearly wrong and unjust. We disagree.

---

[10]Wilson had entered into evidence bills for past medical expenses totaling $10,902.83, which included records from the ambulance company ($1,556.92), the hospital at which she was treated after the wreck ($5,322.63), a pharmacy ($2,797.00), and another medical group ($809.28).

### 1. Standard of Review

A court may overturn a jury's damages finding only if the evidence supporting it is so weak or is so contrary to the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *see also Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). An appellate court cannot set aside a jury finding merely because it would have weighed the evidence differently or made a different finding. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

Thus, when presented with an argument that a jury's failure to award damages is against the great weight and preponderance of the evidence, we must consider and weigh all of the evidence to determine whether it is sufficient to support the verdict. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *see Gregory v. Chohan*, 670 S.W.3d 546, 557 (Tex. 2023). In conducting our factual-sufficiency review, we must bear in mind that, as always, "[w]hen evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may 'believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness.'" *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (quoting *Golden Eagle Archery*, 116 S.W.3d at 774–75).

## 2. Applicable Law

Generally, a jury has great discretion in considering evidence on the issue of damages, and its findings are entitled to great deference from an appellate court. *See In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, orig. proceeding); *Hammett v. Zimmerman*, 804 S.W.2d 663, 664–65 (Tex. App.—Fort Worth 1991, no writ). This is especially true of damages for physical pain and mental anguish because they are inherently speculative in nature. *Hunter v. Tex. Farm Bureau Mut. Ins. Co.*, 639 S.W.3d 251, 260 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

When addressing a jury's findings as to such speculative damages, Texas courts uniformly recognize a distinction between cases where the plaintiff presented uncontroverted "objective" evidence of an injury and those where the plaintiff's injuries are more "subjective" in nature. *Rumzek v. Lucchesi*, 543 S.W.3d 327, 332 (Tex. App.—El Paso 2017, pet. denied) (collecting cases). "[T]he more subjective the damages alleged, the more deference we give to jury findings on those damages." *Hudetts v. McDaniel*, No. 07-96-0353-CV, 1997 WL 716883, at *6 (Tex. App.—Amarillo Dec. 17, 1997, no pet.) (not designated for publication) (citing *Hyler v. Boytor*, 823 S.W.2d 425, 427 (Tex. App.—Houston [1st Dist.] 1992, no writ)); *see Rumzek*, 543 S.W.3d at 333–35 (contrasting types of objective injuries—fractures, organic brain syndrome, nerve damage, burns, cuts, and lacerations, tendinitis, and torn muscles requiring surgery—against soft-tissue injuries that are more subjective in nature—

strains, sprains, and "degenerative disc disease"). "When there is uncontroverted, objective evidence of an injury and the causation of the injury has been established, appellate courts are more likely to overturn jury findings of no damages for past pain and mental anguish." *State Farm*, 483 S.W.3d at 263.

"But 'more likely' does not necessarily mean 'must.'" *Blevins v. State Farm Mut. Auto. Ins. Co.*, No. 02-17-00276-CV, 2018 WL 5993445, at *9 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.). Even objective evidence of an injury does not mandate a damages award if the injury is "less serious and accompanied only by subjective complaints of pain," particularly where an award of past medical expenses is made. *State Farm*, 483 S.W.3d at 264; *see also McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ) (noting that jury evidently found injury "so minimal as to not warrant an award for past pain and suffering" despite awarding medical expenses for treatment of muscle spasms).

It follows, then, that evidence of an injury is more subjective in nature when the injury's existence and symptoms largely depend on the plaintiff's word, rather than medical testing that yields reasonably certain results. *Hunter*, 639 S.W.3d at 260; *see Ononiwu v. Eisenbach*, 624 S.W.3d 37, 45–46 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding that evidence was more subjective where sole objective evidence of injury was plaintiff's inconclusive x-rays and MRIs, and remaining evidence of injury consisted of plaintiff's testimony and medical records reflecting what he told his treaters). In such cases, the jury may decline to award damages for physical pain or

15

mental anguish because their existence essentially turns on the plaintiff's credibility—the evaluation of which lies solely with the jury. *Hunter*, 639 S.W.3d at 260.

Moreover, to recover damages for mental anguish, the "record must provide either direct evidence of the nature, duration, and severity of a plaintiff's mental anguish, thus establishing a substantial disruption in his daily routine, or evidence of a high degree of mental pain and distress that exceeds mere worry, anxiety, vexation, embarrassment, or anger." *Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *18 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (mem. op.).

### 3. Past Pain and Mental Anguish

The evidence of Wilson's past pain and mental anguish was almost entirely subjective, consisting primarily of her testimony and the testimonies of Jones and Pimpleton, medical records that reflected what she reported to her treaters, and radiological scans of her spine showing conflicting results. Thus, Wilson's credibility and, to a lesser extent the credibility of Jones and Pimpleton, were central to her claims for physical pain and mental anguish. Accordingly, the jury's role in analyzing this evidence and assessing her damages was "paramount." *Stone v. Christiansen*, No. 02-22-00450-CV, 2023 WL 5766076, at *6 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op.).

The jury had reason to believe that the wreck between Wilson and Murphy was not severe enough to have caused an injury from which Wilson suffered compensable pain and mental anguish. Wilson agreed that she was "bumped" from behind by

16

Murphy's car. Murphy described hitting Wilson "very softly" while traveling only one or two miles an hour, and he also questioned whether she had embellished her injuries at the scene of the wreck. Wilson did not hit her head, lose consciousness, or receive any cuts or bruises from the wreck. Additionally, the only damage to Wilson's car was a dented bumper and damaged sensors; the airbag did not deploy, and the car was still operational after the wreck.

The jury also had reason to question whether Wilson's injuries allegedly caused by the wreck were severe enough to have caused compensable pain and anguish. Wilson showed no overt injuries at the scene of the wreck and only took an ambulance to the hospital upon the advice of the first responders because she had elevated blood pressure. At the hospital she complained of only a headache and neck pain, though she had full range of motion in her neck. X-rays and CT scans performed at the hospital showed no abnormalities and specifically showed that she did not have any acute injuries to her neck.

Wilson testified that she started feeling additional neck, back, shoulder, and hip pain a few days after the wreck and, on the advice of her attorney, sought treatment with Health First and Momentum. However, her PCP notes indicated that her neck and hip pain did not start until September 2021—five months after the wreck. Her chiropractic treatment consisted mainly of electrical stimulation, ultrasounds, and hot and cold packs with the occasional manipulations and adjustments. An X-ray performed at her first visit to Health First was not remarkable. Her treatment at

Momentum consisted of a few injections, prescribing of pain medications, and radiological scans. And Wilson took a six-month break in the middle of her treatments at both facilities.

The herniated discs in Wilson's lower back first appeared in a CT-scan performed about two weeks after the wreck. But this evidence was tempered by Dr. Garzillo's concession that obesity—with which Wilson had been diagnosed—could cause such herniations. The herniated discs in Wilson's neck first showed up in an MRI that was performed more than a year after the wreck. These herniations had not appeared on the CT-scans performed at the hospital on the day of the wreck, and there was no comparison evidence admitted to show the condition of Wilson's neck prior to the wreck. Thus, the evidence of Wilson's herniated discs was not so certain or objective that it required the jury to award her damages for pain and mental anguish. *See Hyler*, 823 S.W.2d at 428 ("Weighing the many subjective complaints against the one objective injury that might have been caused by this accident, it is apparent that the indicia of injury are more subjective than objective.").

Though Wilson, Jones, and Pimpleton testified that Wilson continued to feel pain and discomfort and was less active due to the wreck, Jones also stated that Wilson had improved and gotten "her joy back." Further, the notes from her last visits to Momentum in May 2022 indicated that Wilson only had "mild" pain and that she was "closer to her functional baseline." Finally, Wilson complained only once of wreck-related pain to her PCP five months after the wreck—pain that she never

18

mentioned again despite meeting subsequently with her PCP numerous times. In fact, her PCP noted in August 2022 that Wilson had started a new "hybrid" job, that her anxiety was "better," and that she was swimming "every few days."

Wilson posits that it is "confounding" that the jury awarded her damages for past and future medical expenses but failed to also award her damages for past pain and mental anguish. We disagree.

Texas courts—including this court—have found no issue with a jury's awarding damages for medical expenses but refusing to also award damages for pain or mental anguish. *See, e.g.*, *Stone*, 2023 WL 5766076, at *6; *Oninwu*, 624 S.W.3d at 47. These cases often involve facts very similar to Wilson's—a car wreck where the plaintiff complains of back or neck pain from a soft-tissue injury. *See, e.g.*, *Oninwu*, 624 S.W.3d at 47; *Rumzek*, 543 S.W.3d at 334; *Laquey v. Cox*, No. 02-17-00005-CV, 2017 WL 4413353, at *3 (Tex. App.—Fort Worth Oct. 5, 2017, no pet.) (mem. op.). Ultimately, such awards are not made in error because they concern highly subjective evidence of pain and anguish the evidence of which comes almost solely from the plaintiff herself. The jury is thus free to disbelieve this evidence entirely or to decide that the plaintiff's pain and mental anguish does not rise to compensable levels. *See Ononiwu*, 624 S.W.3d at 47 ("A jury may reasonably find that a plaintiff should be compensated for seeking enough medical care to confirm that he has not been seriously injured, but that he did not suffer pain or impairment warranting damages.") Accordingly, we cannot

conclude that the jury erred by awarding Wilson past and future medical expenses while also declining to award her damages for past pain and mental anguish.

Wilson also suggests that Dr. Garzillo's testimony gave grounding for at least some award of past pain and mental anguish. However, Dr. Garzillo had never treated Wilson and could only provide opinion testimony related to Wilson's need for *future* medical care and the likelihood that her condition would worsen into pain "flare-ups" that would increase in intensity as she aged. We fail to see how this evidence speaks materially to Wilson's *past* pain and mental anguish to an extent requiring the jury to have awarded her such damages.

For these reasons, we hold that the damages awards for past physical pain and past mental anguish were not against the great weight and preponderance of the evidence, and we overrule Wilson's first issue.

## B. EXCLUSION OF DR. DAVIS'S TESTIMONY

In her second issue, Wilson argues that the trial court abused its discretion by excluding Dr. Davis's expert testimony because she showed (1) that there was good cause for her untimely expert designations and (2) that allowing Dr. Davis to testify would not have unfairly surprised or prejudiced Murphy. Wilson also argues that the trial court's exclusion of Dr. Davis's testimony constituted a Rule 215 sanction for discovery abuse and that the trial court abused its discretion by issuing this sanction without first considering lesser sanctions.

20

## 1. Standard of Review and Relevant Law

We review a trial court's evidentiary rulings and enforcement of a scheduling order for an abuse of discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Gunn v. Fuqua*, 397 S.W.3d 358, 377 (Tex. App.—Dallas 2013, pet. denied); *see Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning*, 972 S.W.2d at 43.

"When a party fails to timely designate an expert, exclusion is mandatory and automatic unless the court finds there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party." *Pjetrovic v. Home Depot*, 411 S.W.3d 639, 646–47 (Tex. App.—Texarkana 2013, no pet.) (internal quotations omitted); *see* Tex. R. Civ. P. 193.6; *Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009); *see also Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992) ("[T]he trial court has no discretion to admit testimony excluded by the rule without a showing of good cause."). "A party who fails to timely designate an expert has the burden of establishing good cause or a lack of unfair surprise or prejudice before the trial court may admit the evidence." *Gillenwater*, 285 S.W.3d at 881.

### a. Good cause

Wilson argues that good cause existed to explain her counsel's "inadvertent failure to timely designate" Dr. Davis due to "calendaring issues that arose as a result of a large staff turnover." But the good-cause exception is usually available only in "difficult or impossible circumstances." *Alvarado*, 830 S.W.2d at 914; *Cresson Int., LLC v. Rooster*, No. 02-21-00366-CV, 2022 WL 3904968, at *6 (Tex. App.—Fort Worth Aug. 31, 2022, pet. denied) (mem. op.). And it is well-settled that inadvertence of counsel does not generally constitute good cause for failure to adhere to discovery deadlines. *Alvarado*, 830 S.W.2d at 915 ("If inadvertence of counsel, by itself, were good cause, the exception would swallow up the rule, for there would be few cases in which counsel would admit to making a deliberate decision not to comply with the discovery rules."); *Cresson*, 2022 WL 3904968, at *6 (holding that appellant failed to show good cause for untimely discovery when its counsel cited pandemic-related reasons for missing deadlines).

Here, Wilson's counsel vaguely credits "calendaring issues that arose as a result of large staff turnover" as the reason why the expert-designation deadline was missed. The trial court was provided no particulars about what caused the staff turnover—a problem that law offices regularly combat—or even the time-period affected by that turnover. Essentially, Wilson asked the trial court to find that her attorney's commonplace inadvertence was good cause for missing the deadline. Faced with this,

we hold that the trial court did not abuse its discretion by not finding good cause to excuse Wilson's untimely expert designation.

## b. Unfair surprise or prejudice

Wilson next argues that she showed that allowing Dr. Davis to testify would not have resulted in unfair surprise or prejudice to Murphy because Dr. Davis's name was contained in medical records and other discovery responses and because his testimony would have been "materially the same as what was contained in the records and affidavit previously produced." Thus, says Wilson, Murphy was provided all information necessary to prepare to cross examine Dr. Davis at trial in a timely fashion.

While there is a preference for cases to be decided on a full presentation of their merits, Texas law also recognizes that "[a] party is entitled to prepare for trial assured that a witness will not be called because opposing counsel has not identified him or her in response to a proper interrogatory." *Pjetrovic*, 411 S.W.3d at 646–47 (citing *Smith v. Sw. Feed Yards*, 835 S.W.2d 89, 91 (Tex. 1992)). Though Wilson contends that Dr. Davis's name was "all over" her medical records, she did not— despite bearing the burden to do so—identify any such specific records to the trial court or on appeal. To the contrary, Dr. Davis's involvement in Wilson's care and the possibility that he would be used as an expert at trial is not as obvious from the record as she would have it. Our investigation of the medical records available to us reveals that Dr. Davis's name appears on only two of hundreds of pages of records, and even

then only once in the header of a Health First referral form and on a routine intake form. And, of course, Dr. Davis himself testified that he had never actually treated Wilson.

Beyond these two passing mentions in the medical records, Dr. Davis's name does not appear again in the record until February 9, 2023—less than three weeks before trial and after the discovery deadline had passed—when Wilson supplemented her Rule 194 disclosures and included him in a narrative outlining all of her medical treatment. And, importantly, the first time that Wilson explicitly indicated to Murphy that she desired to call Dr. Davis as an expert did not come until a hearing on the first day of trial.

Wilson contends that *Elliot v. Elliot* is factually similar to her case and supports her argument that Murphy was not unfairly surprised or prejudiced by her failure to timely designate Dr. Davis. 21 S.W.3d 913, 921 (Tex. App.—Fort Worth 2000, pet. denied). We disagree.

In *Elliot*, the trial court excluded mental-health-expert testimony at a pretrial bill-of-review hearing. *Id.* The appellant had failed to include any medical experts within her answer to an interrogatory requesting a list of experts. *Id.* However, within the same set of interrogatories, she did provide a list of her mental-health providers in response to an interrogatory requesting the identities of all providers from whom she had received treatment. *Id.* We held that the trial court abused its discretion because the appellant's mental health was at issue and she had timely and specifically listed

24

each potential expert in response to an interrogatory within the same set of interrogatories.[11] *Id.*

Unlike in *Elliot*, Wilson never explicitly identified Dr. Davis in a timely response to discovery. As we just pointed out, except for being buried in hundreds of pages of medical records, Dr. Davis's name does not appear in the record until Wilson supplemented her Rule 194 disclosures after the close of discovery and on the eve of trial.

On these facts, we hold that the trial court did not act "without reference to any guiding rules or principles" when it determined that Wilson had failed to show that her failure to timely designate Dr. Davis as an expert would not unfairly surprise or prejudice Murphy. *See Low*, 221 S.W.3d at 614.

### c. Sanction for discovery abuse

Finally, Wilson argues that the exclusion of Dr. Davis's testimony was effectively a Rule 215 sanction for discovery abuse and that the trial court abused its discretion by enacting that sanction without first considering lesser sanctions. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) (explaining that for a sanction to be just it must be no more severe than necessary to satisfy the legitimate purpose of discouraging further discovery abuse). But Wilson failed to preserve this

---

[11]Ultimately, we held that the error was harmless. *Id.* at 922.

argument for review and, regardless, the law does not support her characterization of the trial court's ruling as a sanction for discovery abuse.

Wilson never presented this argument to the trial court—neither at trial when the trial court excluded Dr. Davis's testimony nor in her motion for new trial. In general, a party must first present its complaint to the trial court and cannot raise it for the first time on appeal—this includes complaints that the trial court abused its discretion by issuing a certain sanction for discovery abuse. Tex. R. App. P. 33.1(a); *Burbage v. Burbage*, 447 S.W.3d 249, 258 (Tex. 2014); *see Jurgens v. Martin*, 631 S.W.3d 385, 408 (Tex. App.—Eastland 2021, no pet.) (holding that appellant failed to preserve Rule 215 discovery-abuse-sanctions complaint); *Lucchese Boot Co. v. Licon*, 388 S.W.3d 365, 376 (Tex. App.—El Paso 2012, no pet.) (same). We hold that Wilson failed to preserve this complaint for our review.

Even if Wilson had preserved her complaint, it would be unavailing. A trial court's exclusion of an expert witness on the grounds that he was untimely designated—as occurred here—has been repeatedly held to be a ruling on a substantive deficiency rather than a Rule 215 sanction. *See White v. Browning*, No. 03-04-00273-CV, 2006 WL 151980, at *5 (Tex. App.—Austin Jan. 19, 2006, pet. denied) (mem. op.) (collecting cases). This makes sense because a trial court *must* exclude an untimely-designated witness absent a showing of good cause or unfair surprise or prejudice. Because Wilson failed to make such a showing, the trial court's only option

26

was to exclude Dr. Davis's testimony; doing so could not have been an abuse of discretion. *See id.*

For these reasons, we overrule Wilson's second issue.

### III.  CONCLUSION

Having overruled both of Wilson's issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  April 11, 2024