

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00052-CV

**IN RE** Jordyn **ELLIS**

Original Mandamus Proceeding[1]

Opinion by: Rebeca C. Martinez, Chief Justice

Sitting: Rebeca C. Martinez, Chief Justice
H. Todd McCray, Justice
Velia J. Meza, Justice

Delivered and Filed: July 16, 2025

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

In the underlying proceeding, Angela Meyer and her son, Evan Meyer (collectively the "Meyers"), the real parties in interest, filed a negligence claim against Jordyn Ellis, the relator, to recover damages for personal injuries allegedly sustained during a motor vehicle accident. The jury found that neither Ellis's nor Angela's negligence proximately caused the accident. The Meyers filed a motion for new trial, arguing that the evidence supporting the jury's finding as to Ellis was factually insufficient. The trial court signed an order granting the Meyers's motion and, after Ellis filed her petition for writ of mandamus, an amended new-trial order. In a single issue, Ellis complains that the trial court clearly abused its discretion in granting a new trial because the

---

[1] This proceeding arises out of Cause No. 2020-CI-16785, styled *Angela Meyer and Evan Meyer v. Jordyn Ellis*, pending in the 288th Judicial District Court, Bexar County, Texas, the Honorable Cynthia Marie Chapa presiding.

evidence supporting the jury's verdict is not factually insufficient, and she lacks an adequate remedy by appeal. We conditionally grant mandamus relief.

## I. BACKGROUND

### A.    Ellis

Shortly after 6:45 a.m. on January 15, 2019, Ellis drove westbound on TPC Parkway near its intersection with Highway 281 in her 2015 four-door Toyota Tacoma pickup. Ellis intended to turn left, crossing the eastbound lane of TPC Parkway that was demarcated by construction barrels, and onto a "private driveway," the first parallel roadway to the frontage of Highway 281, to go to her bank before her day as a teacher began. An aerial photograph of the area after road construction had been completed,[2] tendered by the Meyers, was admitted showing:



Ellis recalled that the vehicle in front of her made the same left turn. Ellis stopped behind that vehicle, but she could not remember stopping again after that vehicle turned onto the private driveway. Ellis testified that she looked for oncoming traffic, and not seeing any, she proceeded

---

[2] At the time of the incident, the concrete curb that would have prevented the left turn that Ellis executed had not been installed.

to make the left turn. Ellis estimated that she was driving between five-and-ten miles-per-hour at the time Angela's 2015 Toyota Camry collided with the passenger side of her vehicle. Ellis acknowledged that the speed limit in the area was thirty-five miles-per-hour.

At trial, Ellis recalled her pre-trial deposition testimony that a police officer told her that Angela must have been speeding based on the amount of property damage. However, at trial, Ellis acknowledged that an EMS or firefighter may have made that statement. The trial court admitted photographs showing extensive front-end damage and deployed airbags to Angela's 2015 Toyota Camry. One of the photographs depicts:



In Ellis's pre-trial deposition testimony, read aloud before the jury by the Meyers's counsel during his examination of her, Ellis noted that:

> I still do not know how fast. It just solidified the fact that I thought they were driving very fast because if I didn't see them come around the corner they must have been driving fast. And then when the officer came over to talk to me, he also mentioned it again and that's how I got that.

At trial, Ellis reiterated her belief that Angela was driving fast because she never saw her. On questioning by the Meyers's counsel, Ellis testified:

> Q.     Do you have any idea what qualifications this person that told you my client must have been driving fast what their qualifications were to judge speed based on what the car looked like?
>
> A.     They were either EMS, police, or a firefighter.
>
> Q.     Were they trained in accident reconstruction?
>
> A.     I'm not sure.
>
> Q.     The laws of physics?
>
> A.     I am not sure of their credentials.
>
> Q.     When they say fast, I mean, did they say fast as in 35? 30? Did they ever put a number on it, ma'am?
>
> A.     No, sir.
>
> Q.     Okay. So we're not really sure what that means, would you agree?
>
> A.     Means that from what I was told that they were moving fast to cause that kind of damage to their car and not to mine.

Ellis acknowledged that Detective Picasso noted in his accident report her failure to yield the right-of-way as a contributing factor to the accident. However, Ellis disputed this finding because she almost made it through the intersection. Photographs of Ellis's pickup, admitted into evidence, show damage to the rear passenger-side door and the back portions of the front passenger-side door. One of the photographs depicts:



No damage is seen around the front passenger wheel or hood of Ellis's pickup. Ellis explained, "I do not believe there's anyone to blame. We both had reasons that resulted in the crash and we both could have done things differently that day."

A day or two after the accident, Ellis sought treatment from an urgent care facility. Ellis believed that the accident aggravated prior neck injuries. She received physical therapy, massages, and acupuncture for approximately six months to alleviate the pain that she attributed to the accident.

**B. Angela**

On the morning of the accident, Angela was driving Evan, a sophomore in high school, to his cross-country practice. Angela recalled exiting the US Highway 281 frontage road, slowing as she turned right at the intersection of US Highway 281 frontage road and TPC Parkway, and beginning to proceed down TPC Parkway. Angela testified that she "built up speed as [she] was going straight on TPC Parkway and then the crash happened." Angela denied running late or

speeding at the time of impact. Angela had activated her vehicle's headlights because it was very dark, and the area did not have a lot of streetlights.

Angela could not recall whether other vehicles were traveling in front of or behind her, or whether the light controlling her travel at the intersection of US Highway 281 frontage road and TPC Parkway was green or red. In her deposition testimony, Angela claimed to have been driving at twenty-five miles-per-hour at the time of impact. However, at trial, she acknowledged that John Smith, a professional engineer retained by the Meyers, believed she was traveling between thirty and thirty-five miles-per-hour.

## C.    Evan

Evan testified that cross-country practice usually started between six and seven in the morning. As for the impact, Evan recalled:

> We were actually in the middle of a prayer. I had a pancake. I was eating breakfast on the way to practice. And I remember my mom gasping and then it just — I don't remember much of the direct impact. But I remember seeing afterwards it was smokey. The airbags were all gone off. My mom asked me if I was okay. I told her I was okay. And then she told me to get out of the car because she was afraid it was on fire.

Evan could not recall whether Angela made a full stop before proceeding from the Highway 281 frontage onto TPC Parkway.

## D.    Smith

Smith is a licensed professional engineer specializing in the areas of accident investigation, reconstruction, and biomechanical analysis. Smith acknowledged that "[t]he officer said that people were allowed to turn there and Ms. Ellis said she had done it before and I believe after the collision. So I don't know any reason you can't take a left there safely, if you do it safely." However, data from the event data recorder on Ellis's vehicle revealed, according to Smith, that her vehicle "did not register a stop . . . in the four and a half, five seconds before impact." On direct

examination by the Meyers, Smith was asked: The defendant testified that she did, in fact, yield the right-of-way. How do you respond to that statement? Smith answered:

> Well, when she began turning, the Meyer's vehicle was close to enough to present an immediate hazard. And so that's the rule is you may not turn left in front of a vehicle that's close enough to present an immediate hazard.
>
> Now, I understand the defendant said she didn't see it. That's not a reason there. If you can't see, you don't turn. And if you're not quite sure then you pull up a little bit and stop or pull up a little bit and stop.
>
> But the point of the matter is we know as a fact that the Meyer vehicle was — Ms. Meyer was where she was supposed to be, doing what she's allowed to be doing, which is driving the road about the speed limit. Maybe a little bit under.
>
> Whereas if Ms. Ellis simply yields to a vehicle that's close enough to present an immediate hazard, then there'd be no collision.
>
> As for Angela, Smith estimated that she was traveling around thirty-to-thirty-five miles-

per-hour at the time of impact. On cross examination by Ellis, Smith was asked and answered:

> Q.      Now, can you rule out that Mrs. Meyer was going over 35 miles per hour at the time of the accident?
>
> A.      I can't prove it beyond any doubt. The physics tells me I know force had to be applied there. But far more likely than not she was in the range of 30 to 35. Could she have been 37, yes. But I think 30 to 35 is far more likely than not.
>
> Q.      I believe in your deposition you said it would not be impossible for her to have been going 40 miles per hour?
>
> A.      It's not impossible. It's just so unlikely I think we can set it aside.
>
> On the subject of driving speed, Smith testified:
>
> Q.      We talk about speed limits. Going the speed limit does not necessarily mean you're traveling a safe speed, correct?
>
> A.      That's correct. You must travel with all attended circumstances.
>
> Q.      And circumstances could be, you know, wet streets, fog, heavy construction, things like that?

A. Not so much the heavy construction. But, like, in Colorado, blizzard. Absolutely.

On redirect examination by the Meyers, Smith was asked: What do you make of the fact that the defense hired a crash reconstructionist and we're not going to hear from that person? Smith answered: Well, I suspect they would come with my conclusions. We have — we all have the same conclusions.

### E. Police Officers

Tomas Picasso, a detective with the San Antonio Police Department, responded to the call for service. He acknowledged that "[t]here was a lot of construction there [in the area of the accident] for a long time." Detective Picasso noted that Ellis was permitted to turn between the construction barrels while executing the left turn. He described the accident as "kind of a routine minor accident," but that it left everyone "in shock of what was going on." Detective Picasso did not calculate vehicle speeds, elaborating:

> We — we don't — that's not part of our — that's not a detail that we look into on a minor accident. It's hard to — I know it's an accident, but that's not something that we have to notate the speeds of each driver on — on our crash report. Not for this particular type of accident.

Instead, the "TID Unit" performs more extensive investigations into accidents where there is "a fatality or possible fatality, if somebody has serious injuries." He noted in his report Ellis's failure to yield the right-of-way turning left as a contributing factor to the accident. Detective Picasso was asked by the Meyers: Would you agree that a driver making a left-hand turn without a traffic control device like at that particular area should ensure they are giving the proper right-of-way to oncoming traffic? To which he answered: Yes, sir. Detective Picasso believed that Ellis should have seen Angela's vehicle. He did not recall discussing Angela's speed with Ellis.

Jose Juarez, a detective with the San Antonio Police Department, assisted Detective Picasso. Detective Juarez was asked: On an occasion conditions can merit a slower speed

regardless of the speed limit; would you agree with that, sir? He answered: Oh, yes, of course — I mean that is going to be weather, any — any of the — like obviously like you — you explained earlier, the — you know, the construction itself. He never made a conclusion regarding contributing factors.

## F.       Verdict, Post-Verdict Motions, and New-Trial Orders

The jury charge contained the following definitions:

"Negligence" means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

Question No. 1 asked and the jury answered:

Did the negligence, if any, of those named below proximately cause the occurrence in question? Answer "Yes" or "No":

1.    Jordyn Ellis          *No*
2.    Angela Meyer          *No*

Ellis moved for a take nothing judgment, and the Meyers moved for a mistrial or new trial. The trial court signed an order granting new trial. After, Ellis filed her petition for writ of mandamus, and the Meyers filed a motion to enter a second new-trial order. The trial court signed a second new-trial order that included discrete findings, discussed below, and an ultimate finding that "Ellis failed to use ordinary care, and this failure was the proximate cause of the crash made

the basis of this lawsuit." Ellis sought mandamus relief, and the Meyers, upon our request, filed a response.

## II. DISCUSSION

### A. Standard of Review

Mandamus is an extraordinary remedy. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam). Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding). The relator bears the burden of proving these requirements. *In re H.E.B. Grocery Co.*, 492 S.W.3d at 302; *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). An abuse of discretion occurs when a trial court's ruling is arbitrary and unreasonable or is made without regard for guiding legal principles or supporting evidence. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding); *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). A writ of mandamus will issue to correct a clear abuse of discretion committed by a trial court in granting a new trial. *In re Whataburger Rests., LP*, 429 S.W.3d 597, 598 (Tex. 2014) (orig. proceeding) (per curiam); *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 756–57 (Tex. 2013) (orig. proceeding); *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding).

Ellis argues that the trial court abused its discretion by finding the jury's verdict was against the great weight and preponderance of the evidence. Therefore, we review the trial court's ruling to determine if its reason for granting the new trial is supported by the underlying record. *In re Ybarra*, No. 04-17-00245-CV, 2017 WL 4655347, at *3 (Tex. App.—San Antonio Oct. 18, 2017, orig. proceeding) (mem. op.). We conduct this merits review by applying a factual sufficiency standard to a review of the entire trial record to determine if the record supports the trial court's reason for granting a new trial. *Id*. (citations omitted). If the record does not support the reasons

for the new trial, then the trial court abused its discretion by granting a new trial. *In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 262 (Tex. App.—Fort Worth 2016, orig. proceeding). A factual sufficiency review of a new-trial order in a mandamus proceeding is performed using the same standard as a factual sufficiency review in an appeal. *Id.*

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We "must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency standard of review). "'[T]he jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony' [and its role is] 'to resolve inconsistencies within or conflicts among the witnesses' testimony.'" *Givens v. Anderson Columbia Co., Inc.*, 608 S.W.3d 65, 70 (Tex. App.—San Antonio 2020, pet. denied) (quoting *Lamont v. Vaquillas Energy Lopeno Ltd.*, LLP, 421 S.W.3d 198, 209–10 (Tex. App.—San Antonio 2013, pet. denied)).

## B. Analysis

In seven discrete findings, the second new-trial order finds:

- "[Angela] Meyer was not in a hurry at the time of the incident, she was familiar with the area, and she was not speeding at the time of the crash."

- "[Detective] Picasso stated that anyone turning left at that intersection must ensure oncoming traffic is clear; however, [] Ellis did not do so."

- "The evidence [] demonstrated that nothing prevented [] Ellis from seeing [Angela] Meyer's vehicle."

- "The evidence showed that had [] Ellis paused and looked for approaching traffic[,] the collision would have been avoided."

- "Ellis admitted she never noticed any car approaching — indicating either she did not check thoroughly or did not pay adequate attention to oncoming traffic."

- "Ellis testified that the construction in the area played no role in the accident."

- "Ellis offered no evidence that [Angela Meyer] was speeding."

Before us, the Meyers, the party who bore the burden of proof, point to: (1) the event data recorder on Ellis's pickup not recording a stop in the five seconds before the accident; (2) Ellis's concession that "she actually had no knowledge regarding how fast [Angela] was driving;" (3) Detective Picasso's agreement with the Meyers's assertion that Ellis should have "ensured" that there was no oncoming traffic; (4) Smith's opinion that Angela did nothing wrong; and (5) Ellis's failure to call her own accident reconstruction expert. The Meyers argue that "[t]here was no evidence other than [] Ellis's self-serving testimony that suggested [Angela] was at fault; rather, [] Ellis simply turned into the path of [Angela's] oncoming car."

Ellis argues that the evidence is factually sufficient because: (1) her left turn was permissible; (2) the jury was free to disregard Angela's testimony; (3) the jury was not bound by Detective Picasso's determination that Ellis failed to yield the right of way; (4) the jury was free to disregard Smith's conclusion; (5) Ellis did not bear the burden of proof and was not required to present a competing accident reconstructionist; and (6) Ellis testified that she acted as a reasonably prudent driver by looking for oncoming traffic before turning.

In *Gomez v. Adame*, 940 S.W.2d 249, 250 (Tex. App.—San Antonio 1997, no writ), referenced by Ellis in her response to the Meyers's motion for new trial and in her petition for writ of mandamus, the jury found that neither the plaintiff nor the defendant driver proximately caused a motor vehicle accident. The plaintiff appealed from the take-nothing judgment, arguing:

> That the following facts establish as a matter of law that [the defendant] breached her duty to maintain a proper lookout and that such breach was the proximate cause of the accident: her acknowledgment that she was required to stop and yield to approaching traffic, the absence of obstructions to her view of approaching traffic, and her failure to see his van until impact.

*Id*. at 251. We observed that the appellant's "argument labors under the misperception that the mere occurrence of a collision establishes negligence as a matter of law." *Id* at 252. Indeed, the Texas Supreme Court recently held that "[a]ccidents happen when something has gone wrong, but not all accidents are evidence of negligence." *Lozada v. Posada*, No. 23-1015, 2025 WL 1717009, at *3 (Tex. Jun. 20, 2025) (per curiam) (citing *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex. 1986)). We summarized the evidence in *Gomez* as:

> [The defendant] testified that she stopped at Chalmers [Street], looked in both directions on Commercial [Street], and entered what she thought was a clear intersection. She acknowledged that [the plaintiff] was not visible until impact, but she did state that [the plaintiff] could have entered Commercial from a side street. While these facts establish the existence of an accident, they do not prove specific acts of negligence on the part of either party.

*Gomez*, 940 S.W.2d at 252. We overruled the appellant's factual sufficiency challenge.

The Meyers's response makes no reference to *Gomez's* factual-sufficiency analysis. Moreover, the second new-trial order's seven discrete findings stray from the standard of review that we articulated and applied in *Gomez*. In this case, as in *Gomez*, Ellis testified that she looked for oncoming traffic, and not seeing any, she proceeded to make the left turn. The Meyers emphasize Detective Picasso's agreement with their assertion that Ellis should have "ensured" she was giving the proper right-of-way to oncoming traffic. The Meyers's emphasis on Ellis "ensuring" that the intersection was clear in support of their factual sufficiency challenge is essentially the same argument that we rejected in *Gomez*. Moreover, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (citing TEX. R. CIV.

P. 272, 274, 278, 279). The jury charge makes no mention of "ensure." Instead, the jury charge in this case fixes the standard of care as "ordinary care," and defines ordinary care as "that degree of care that would be used by a person of ordinary prudence *under the same or similar circumstances*." (Emphasis added).

The jury may have found that the "circumstances" of the accident occurred during a dark, winter, pre-dawn morning and on a roadway that, as Detective Picasso termed it, had "a lot of construction." The jury was tasked with reconciling witness testimony with, among other things, the aerial photograph of the area after road construction. That photograph shows a concrete curb that would have prevented the left turn that Ellis was permitted to take at the time of the accident. The photograph also shows what the jury may have considered to be a gentle curve of the lane that Angela used to seamlessly merge from the frontage of Highway 281 onto TPC Parkway. Additionally, the jury may have weighed the proximity of the intersection Angela was leaving to the one that then-existed between TPC Parkway and the private driveway in assessing the credibility of Ellis's assertion that she looked for oncoming traffic before turning.

The second new-trial order makes three additional findings that also conflict with the appropriate standard of review. First, it insinuates that Ellis improperly crossed construction barrels, stating: [Ellis] was traveling in the westbound lane of [TPC Parkway] and turned left through construction barricades into the eastbound lane, directly in front of [the Meyers], attempting to enter a private driveway. However, Detective Picasso acknowledged that Ellis was permitted to turn between the construction barrels while executing the left turn, and Smith had no quarrel with Detective Picasso's acknowledgment. Second, the new-trial order implies — without any specific reference to evidence — that Angela's vehicle was in close proximity to Ellis's pickup, stating: [T]he evidence shows that [Ellis] had just began [sic] to enter the intersection just before impact. However, the photograph of Ellis's pickup shows no damage around the front

passenger wheel or fender. Instead, the photograph shows damage to the rear passenger-side door and the back portions of the front passenger-side door. Lending appropriate deference to the jury's factual determinations, it may have found that Ellis had not "just began [sic] to enter the intersection just before impact." Third, the new-trial order faults Ellis for not presenting an accident reconstructionist at trial. However, the new-trial order provides no legal basis for its insinuation that the jury was obligated to accept Smith's opinions. Moreover, such an insinuation is contrary to several of our sister courts' holdings that "[b]ecause operating a motor vehicle is within the common experience of laypersons, we conclude that resolution of whether [a driver] breached his duty to maintain a proper lookout does not require expert testimony." *Cf. Pleasant v. Hernandez*, No. 14-21-00617-CV, 2022 WL 3655176, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 25, 2022, no pet.) (mem. op.) (collecting cases).

Having laid out an appropriate factual sufficiency analysis, the seven discrete findings and three additional findings did not lend appropriate deference to the jury's determination of the witnesses' credibility and resolution of conflicting or inconsistent testimony. *See Givens*, 608 S.W.3d at 70. Accordingly, we conclude that the trial court clearly abused its discretion in substituting its judgment for that of the jury and determining that the jury's verdict was against the great weight and preponderance of the evidence. Moreover, the Texas Supreme Court "has recognized that there is no adequate remedy by appeal when a district court issues an erroneous new-trial order." *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 298 n.5 (Tex. 2023) (orig. proceeding). Therefore, we sustain Ellis's sole issue.

### III. CONCLUSION

Having examined and fully considered Ellis's petition for writ of mandamus, the Meyers's response, Ellis's supplemental petition and reply, the mandamus record, and the applicable law, we are of the opinion that Ellis has met her burden to obtain mandamus relief as stated herein. We

conditionally grant Ellis's petition for writ of mandamus. We direct the trial court to vacate its Second Order Granting New Trial, signed on April 10, 2025, and sign a final judgment on the jury's verdict. We are confident that the trial court will promptly act in accordance with this memorandum opinion. Accordingly, the writ of mandamus will issue only if the trial court fails to comply with this memorandum opinion within fifteen calendar days of its issuance.

Rebeca C. Martinez, Chief Justice